☐ King West  ☐ OICW
☐ White Center  ☐ MLK
☐ King East  ☐ King Southwest
☒ King Southeast  ☐ Adoptions/BRS

| Superior Court of Washington<br>County of King Juvenile Court | |
|---|---|
| Dependency of:<br><br>ACZ<br>dob:  ACZ<br><br>minor child | No: 20-7-00666-0 SEA<br><br>**Order of Dependency as to the mother, Myriam Zayas**<br>**(OROD)**<br>☒ Contested as to ☒ mother ☐ father ☐ other<br>☒ Disposition Order (ORDD) Included<br>**CLERK'S ACTION REQUIRED**<br>Paragraphs 4.1, 4.3, 4.6 (EDL), 4.15, and the boxes below. |

The court will hear an ☒ initial progress review hearing on (date) __12/09/20__, at 11:00 a.m. at:

King County Superior Court, Room/Department: Rm. W-719, located at:
☒ King County Courthouse, 516 Third Avenue, Seattle, Washington 98104.

Instructions for the option of attending that hearing virtually will be circulated via email prior to the hearing date.

**Additional clerk's action required:** Enter the code(s) that apply.
*About today's hearing:*
Was adequate and timely notice given to the child's caregiver?  Yes (CGATN) ☒    No (CGNATN) ☐
Did the court receive a caregiver report?  Yes (CGRR) ☐ / No ☒    ☐ The caregiver appeared. N/A

## I. Hearing

1.1  **Petition**: A petition was filed by DCYF alleging that the above-named child is dependent, and the Court held a hearing on September 21, 22, 28, 29, 30, and October 1, 2020. The Court issued its oral ruling on October 7, 2020.

1.2  **Appearance**: The following persons appeared at the hearing (remotely due to COVID protocols):
☒ Mother - Myriam Zayas (*See 1.4*)         ☐ Mother's Lawyer- n/a - *pro se*
☒ Child's CASA – Pauline Duke                    ☒ GAL/CASA's Lawyer – Jennie Cowan
☒ DCYF Worker - Jamaal Magee                   ☒ Agency's Lawyer - David LaRaus

1.3  **Basis**: ☒ The court took evidence and heard testimony as indicated on the record.

1.4  The mother intermittently appeared and participated throughout the proceedings, as indicated in the record. The mother Ms. Zayas also periodically sent emails to the parties and the Court, which were admitted into evidence.

**Order of Dependency (OROD, ORDYMT)** - Page 1 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

## II. Findings

Except where otherwise indicated, the following facts have been established by a preponderance of evidence:

2.1 **Child's Indian Status**: ☒ On ___9/21/20___ and ☒ On ___03/17/2020___, the court asked each participant on the record whether the participant knows or has reason to know the child is an Indian child.

The petitioner ☒ has ☐ has not made a good faith effort to determine whether the child is an Indian child.

☒ Based upon the following, there is not a reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding:

<u>The mother has denied any Native American ancestry, or eligibility for membership in any Federally Recognized Tribe, in this and in prior dependency proceedings. Paternity is not established. There is no reason to believe the child is a member or eligible for membership of any Federally Recognized Tribe.</u>

2.2 **Facts**: ☒ The following facts establishing dependency have been proved:

a. Myriam Zayas (DOB: ▮▮▮▮) is the mother of the child **ACZ** (DOB: **ACZ**). Ms. Zayas is not a service member. No father is listed on the birth certificate for the child, and the father of the child is unknown. Previously the mother had identified ▮▮▮▮ as the child's alleged father, but he was dismissed as a party to a previous dependency for this child (14-7-01695-4 SEA) on 12/31/2014, after genetic paternity testing established that he is not the biological father of **ACZ**.

b. Myriam Zayas is also the biological mother of three other children: **JZ** (DOB: **JZ**), **MBZ** (DOB: **MBZ**) and **CZ** (DOB: **CZ**).

c. On 2/09/20 Myriam Zayas gave birth to **CZ** at the UW Medical Center in Seattle. Hospital employees contacted DCYF due to concerns that Ms. Zayas had inconsistent prenatal care and tested positive on 2/07/20 for methamphetamines. **CZ** was adopted at birth through a private action with the agreement of Ms. Zayas.

d. **MBZ** (DOB: **MBZ**) and **JZ** (DOB: **JZ**) were declared dependent in Pierce County in 2009 (case nos. 09-7-01466-7 / 465-9), on the basis that the mother's use of methamphetamines and alcohol impaired her ability to safely and adequately care for the children. The children were placed out of the home. **JZ** was later returned to the mother's care and the dependency as to her was dismissed. The dependency case for **MBZ** was dismissed after his father obtained a parenting plan placing the child in his care.

e. **JZ** was declared dependent a second time, in King County in 2013 (case no. 13-7-12094-0 SEA). The mother entered an agreed order of dependency on 3/14/14, agreeing to facts providing a basis for dependency that included her continuing use of methamphetamines, despite repeated attempts to engage in treatment. **JZ** was placed in licensed care, and the mother agreed to participate in services including a drug/alcohol evaluation and follow recommendations, urinalysis (UA) testing, and a foster care reunification assessment. **JZ** was not returned to the mother's care during that dependency; the mother participated in the ordered services, but did not engage in regular visitation with the child, and the mother relinquished her parental rights to **JZ** on 1/21/15 (case no. 15-7-00270- SEA).

**Order of Dependency (OROD, ORDYMT) -** Page 2 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

f. ▉ACZ▉ was previously declared dependent in King County as an infant (case no. 14-7-01695-4 SEA). The mother entered an agreed order of dependency as to ▉ACZ▉ on 11/19/14. The mother agreed to facts creating a basis for dependency, including that (summarized): she had a fifteen-year history of substance abuse, particularly of methamphetamines; she had previously completed inpatient and outpatient treatment programs but had relapsed; the mother was currently participating in intensive outpatient treatment and had scheduled an intake for mental health services. As part of that order the mother agreed to participate in random UA tests, ongoing chemical dependency treatment, parent coaching, and a neuropsychological evaluation and to follow any resulting recommendations.

g. During the course of the 2014 dependency case for ▉ACZ▉ the mother participated in services including urinalysis testing, chemical dependency treatment, and parent coaching. She also participated in a neuropsychological evaluation performed by Dr. Paul Connor, to evaluate whether there were biological reasons that multiple treatment efforts had been ineffective in preventing further substance use. Dr. Connor reported that testing of Ms. Zayas' problem-solving and decision-making abilities indicated that these were areas of strength for her, but that if she resumed actively using substances these skills could be significantly and negatively impacted. The dependency case was dismissed by the court on 10/28/15, after the child had been successfully returned home to her mother.

h. The Department filed the current dependency action as to ▉ACZ▉ after attempting to work with the mother following the birth of ▉ACZ▉ On 02/18/20, CPS Investigator Owens spoke with Ms. Zayas, who reported a history of substance use of methamphetamines starting at age 18, but that the last time she used it was a couple years ago. When asked about her positive test for amphetamines on 2/07/20, Ms. Zayas attributed the result to her having taken Benadryl. When asked if she would complete a urinalysis test for the Department. Ms. Zayas stated she would not do so without a court order. Then on 02/21/20, Investigator Owens received a call from hospital Auburn Medical, reporting concerns of manic and strange behavior by Ms. Zayas. On 2/23/2020, Investigator Owens texted Ms. Zayas regarding her participation in a Family Team Decision Making Meeting (FTDM) scheduled for 2/24/2020. Ms. Zayas replied in curse-and-insult-filled texts, refusing to attend the meeting, and telling the worker that if she continued to contact her the mother would call the police and have the worker charged with harassment.

i. On 2/24/20 Ms. Zayas showed up with ▉ACZ▉ for the FTDM. Ms. Zayas again asserted that her positive UA result at the hospital was due to her taking Benadryl. When confronted with the fact that Ms. Zayas tested positive for methamphetamines and not Benadryl, she stated "what are you going to do about it." Ms. Zayas did agree to do 30 days of UAs, but refused to sign a release of information (ROI) form for the Department to have direct access to the results. When asked if she would like or accept any other services from the department, to help address her medical or mental health needs, and Ms. Zayas responded "hell no."

j. On 03/05/20 the mother provided a UA sample, which tested positive for amphetamines and methamphetamines. On 03/13/20, Investigator Owens informed Ms. Zayas that another FTDM was scheduled for 03/16/20 to discuss that positive UA result. Ms. Zayas stated that the test was incorrect, and that she knew how to defeat a UA test for amphetamines if she had been using them.

k. The Department filed a dependency petition on ▉ACZ▉ and an initial shelter care hearing was held on 3/17/20. The mother was represented at that hearing and contested the need for out-of-home placement for the child. Following a hearing the court ordered that ▉ACZ▉ be placed in licensed foster care. At the hearing the Department recommended that the mother engage in remedial services including drug/alcohol assessment and follow recommendations, random UA testing, mental health evaluation and follow recommendations, and a parenting assessment and follow recommendations. The mother did not agree to having any services ordered at that hearing.

l.  Since the initial shelter care hearing on 3/17/20 the mother has provided seven (7) verified UA tests. Of these, the sample collected on 04-23-20 was invalid because it was diluted, the sample collected on 05-13-20 was positive for methamphetamines and amphetamines, and the sample collected on 09-25-20 was positive for methamphetamines and amphetamines. The mother provided the Department with some other tests results she said she had obtained privately, but identification information was redacted and the mother would not provide the Department with an ROI to verify the results. The mother also obtained a drug/alcohol evaluation in April, in which she denied any current use; the evaluation recommended intensive outpatient treatment based on her long history of abuse, but she did not fully complete that treatment. She obtained a subsequent evaluation in September of 2020 that recommended inpatient treatment.

m.  Since the initial shelter care hearing on 3/17/20 the mother has been inconsistent in attending available visitation with the child ACZ despite the department explaining to her how important it is for the child's emotional welfare for the mother to maintain regular contact with the child. When in-person visitation was suspended due to COVID the mother refused to engage in the available virtual visitation for 6 weeks, despite being provided with a video-ready phone by the Department for that purpose. She would also periodically email the Department stating that visits should be cancelled because she would not participate, but then later she would ask to participate.

n.  Since the initial shelter care hearing on 3/17/20 the mother has engaged in concerning behaviors, including appearing at the DCYF office with police and accusing the Department of kidnapping her child, and then (after the police left) threatening to blow up the office and/or kill the assigned social worker, Jamaal Magee, if her child was not returned to her. She is the subject of an anti-harassment order obtained by the initial foster placement for ACZ after Ms. Zayas located the foster home via an application in ACZ iPad, threatened to demonstrate outside their home, and then (after the child had been removed from the home due to the mother's behaviors) began sending the foster father accusations though his "Linked In" account.

o.  On 6/09/20, assigned dependency Judge Messitt conducted a pretrial hearing on the mother's request to represent herself in the dependency proceedings *pro se*, and to determine whether the mother was in need of a litigation Guardian ad Litem pursuant to RCW 4.08.060. The Court found that the mother was competent to proceed without appointment of a GAL, and that the mother met the criteria to allow her to proceed with *pro se* representation. During this trial, despite often inappropriate and erratic behavior, the mother's presentation has reinforced the finding that she does not require a litigation GAL, and that she fully understands the nature and consequences of the proceedings.

p.  The mother has been in regular communication with the Department throughout the dependency. She has maintained that there are no safety risks to ACZ if returned to her care, and asserts that the Department's actions since the birth of the infant CZ are unrelated to any concerns for the child's welfare, but are instead motivated by racism against white women and/or by the Department's desire to obtain federal funding by placing ACZ out of the mother's care. The mother has sent pages and pages of accusatory emails to the Department during this period, repeatedly refusing to cooperate with the Department or to acknowledge the legitimacy of any concerns about ACZ welfare. The mother has repeated these same allegations in her emails to, and testimony before, the Court. She testified that both she and ACZ are "perfect" and are not in need of any services. The mother has consistently argued but has not presented evidence in support of her claims of discriminatory or financial motivations by the Department. To the contrary, the evidence demonstrates that the mother's preoccupation with these theories and lack of priority for the needs of her child impair her ability to adequately meet this child's basic physical, developmental, and emotional needs.

q.  ACZ attended kindergarten in the classroom of teacher Erin Boyett from September of 2019 until March of 2020, when classes were closed due to COVID. Ms. Boyett had significant

concerns about ACZ welfare during that time. ACZ would frequently miss school or be late, more than the other children; the mother would report that they overslept or that ACZ didn't sleep well so she was keeping her home to sleep. ACZ frequently arrived to school tired and hungry, and underdressed for cold weather. ACZ frequently mentioned that she could only have pancakes or cold cereal at home, and that she couldn't eat too much or she wouldn't have any food for later; ACZ would accept any food that was offered to her, and gathered up leftovers from school lunches to take home.

r.   Ms. Boyett's biggest concern, shared by this Court, was that ACZ was "so emotionally out of control." ACZ struggled to appropriately manage her emotions, often presenting "extreme reactions to minor matters;" she would disrupt the class by yelling and throwing things, or hiding under the table and "completely shutting down." This behavior was unusual compared to the other children in the class; it often resulted after she received any negative feedback (such as being asked wait or not to interrupt), or from receiving attention when she wasn't ready for it. When asked why she was upset, she often responded that she was hungry or tired. Other times she entered class in an escalated emotional state, but when asked the cause she wouldn't want to talk about it. She could generally be refocused if Ms. Boyett gave her a snack and some conversation, but she needed "lots of nurturing attention" and was "very clingy." ACZ academic progress was delayed as a result of her poor attendance and her behavioral issues.

s.   Ms. Zayas communicated with Erin Boyett on several occasions, including asking Ms. Boyett to apologize to ACZ for the mother because "she didn't mean to react that way." Ms. Zayas told Ms. Boyett that at home ACZ would run away from her and hide, and it could take a long time to find her, and that Ms. Zayas found ACZ behavior difficult to manage. ACZ attended daycare before and after school, and sometimes when she found out her mother was going to pick her up from school instead, she would say she didn't want to go with her and wanted to go to daycare.

t.   The facts establish that ACZ would be in danger of substantial damage to her psychological or physical development in the absence of continued involvement by the Department, and supported by necessary Court authority and oversight. The mother has demonstrated that she will not cooperate with the Department in any voluntary efforts to address these risks.

u.   The mother has continued to abuse methamphetamines, which previously impaired her ability to care for her children and resulted in the prior dependency cases for siblings MBZ and JZ and ACZ herself. The exact level of her recent use is unclear, given the mixture of negative, positive, and adulterated UA results. The test results, however, must be viewed in light of the mother's established history of methamphetamine use since age 18. The Court is not persuaded by the mother's insistence that any positive results are due to medications that she has been taking since February. If she has been taking those medications on a daily basis as she testified, and if the medications were responsible for the results, then the results should be consistently positive and they are not. Ms. Zayas also has not provided definitive medical evidence that her specific use of the medication would have resulted in false positives. The use of medications does not explain an adulterated result, which must be viewed in light of the mother's testimony that she knows how to defeat a UA test.

v.   Ms. Zayas testified that drug use is not relevant to these proceedings, and that a child would not be removed from a parent for use of legal substances like alcohol or marijuana. While illegality is a factor, severity of use is a more important factor. Whether legal or illegal, use of a substance to the point that it impacts the ability to adequately care for a child is a proper basis to find that court intervention is required.

w.   In 2015, Dr. Connor articulated that Ms. Zayas' problem-solving and decision-making abilities could be significantly negatively impacted if she resumed actively using substances. There

is a distinct difference between the mother's ability to cooperate and engage with the Department and service providers at that time, and her current refusal to do so. But regardless of whether or not substance abuse is the ultimate cause, the mother has demonstrated erratic and unpredictable behaviors since the initiation of this dependency action, as well as an inability to consistently make good decisions on behalf of ACZ. The Court finfd the testimony of GAL Pauline Duke, teacher Erin Boyett, and social worker Jamaal Magee to be especially informative and credible in this regard.

x.      At age 6, ACZ is entirely dependent on an adult for meeting all of her supervision and care needs. When in the mother's care, however, ACZ often was late to or missed school days and frequently came to school hungry and underdressed, demonstrating that her basic care needs were not being met. ACZ unusually clingy behavior and excessive need for attention show that her emotional needs were not being fully met in the mother's care. The mother's refusal to participate in visitation for extended times, if not occurring on her preferred terms - despite it being explained how important regular parent contact is to a child's welfare - is an example of the mother's failure to prioritize ACZ needs over her own. ACZ is at a developmental stage where she needs to be learning healthy ways to deal with frustrations and social interactions. Yet by her impulsive and angry outbursts (for which she asked Ms. Boyett to apologize to ACZ on her behalf), the mother has modeled unhealthy behavior that is not only harmful for ACZ to experience, but which the child has exhibited, showing her own emotional fragility and delaying her progress in school. When told ACZ was hitting other children at school, Ms. Zayas responded "good", she wants ACZ to defend herself. Since placement and engaging in counseling, ACZ has been doing better with her anger and using her words. The mother has involved ACZ in inappropriate conversation of adult subjects, such as her belief that DCYF kidnapped the child, causing ACZ to become confused and upset. Treating ACZ as a confidant and talking with her as an adult about the mother's problems with DCYF is not an appropriate burden to put on a child, who looks to the parent to provide stability and security. ACZ is too young to self-protect or to reliably report any problems she may be experiencing in the mother's home that need remedial attention. This is compounded by the mother admittedly instructing her not to discuss her home life with others, an instruction that ACZ has followed such as when she told Mr. Magee, "Mom says I can't talk about that" after he asked about her home life. It is very concerning for a parent to prevent a child from providing the limited information a child might express about her needs, especially in light of the evidence that ACZ regularly has experienced hunger, being tired, and anxiety.

y.      Both before and during trial, Ms. Zayas has not shown an appreciation of why the above-listed behaviors are inappropriate or constitute parenting deficits. Instead, she has insisted that she and ACZ are "perfect," she deflects from her behaviors by attacking the Department and other participants in the dependency proceedings, and the proceedings themselves. There is no question that Ms Zayas loves her daughter and she is fiercely protective of her autonomy. But unlike ACZ first dependency case - in which the mother worked with the Department and providers to secure ACZ return – Ms. Zayas now consistently declares that she won't participate in any services to try to remedy behaviors underlying this dependency action. This opposition contradicts a motivation to place ACZ needs above her own.

z.      The mother is not a credible witness or a reliable reporter of historical events. It is not clear how much of this is due to intentional misrepresentation and how much is due to her emotional volatility, exhibited during trial, that obstructs her ability to accurately assess and report the facts. ==Ms. Zayas also denies basic facts that are clearly established, such as her contention that the initial shelter care hearing did not occur, although it is of record that it did occur and Ms. Zayas participated.== In this proceeding, Ms. Zayas has denied ever using methamphetamines in the past, asserts that MBZ dependency proceeding was due to a dog bite, and argues that ACZ first dependency action was due to her losing housing for three weeks. Dependency records refute these claims.

2.3 **Statutory Basis**: ☒ The child is dependent according to RCW 13.34.030(6), in that the child:
☐ (a) has been abandoned, as defined in RCW 13.34.030;
☐ (b) is abused or neglected, as defined in Chapter 26.44 RCW, by a person legally responsible for the care of the child; and/or
☒ (c) has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

2.4 **Placement**:

☒ It is currently contrary to the child's welfare to return home. The child should be placed or remain in the custody, control and care of ☒ DCYF ☐ a relative ☐ an other suitable person for the following reasons:

☒ there is no parent or guardian available to care for the child; and/or
☐ the parent or guardian is unwilling to take custody of the child; and/or
☐ the court finds by clear, cogent and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home, and an order under RCW 26.44.063 will not protect the child from danger.

☒ The child should be placed or remain in:
☐ Relative placement.
☐ Placement with a suitable person
☐ person with whom the child's siblings or half-siblings live.
☒ Licensed care:
☐ pending completion of DCYF investigation of relative placement options.
☒ because there is no relative or other suitable person who is willing, appropriate, and available to care for the child, with whom the child has a relationship and is comfortable.
☐ because there is reasonable cause to believe that relative placement would jeopardize the safety or welfare of the child; and/or hinder efforts to reunite the parent(s) and child.
☐ The child is an Indian child as defined in RCW 13.38.040, and this placement complies with the placement priorities in RCW 13.38.180, and 25 U.S.C. § 1915.

2.5 **Reasonable Efforts**:
☒ DCYF made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home; but those efforts were unsuccessful because:
☒ The health, safety, and welfare of the child cannot be adequately protected in the home.
☒ Specific services have been offered or provided to the parent and have failed to prevent the need for out-of-home placement and make it possible for the child to return home. The following services have been offered or provided to the child and the child's parent(s): ☒ see facts para. 2.2 above
☒ The whereabouts of the unknown father are unknown.

☐ Reasonable efforts are not required at this time to attempt to reunify the child with his/her parent(s), guardian or legal custodian because:
☐ The child has been abandoned.
☐ Aggravated circumstances exist

☐ The court ordered the child removed from the home and DCYF has recommended that a petition be filed seeking termination of the parent-child relationship

**Order of Dependency (OROD, ORDYMT)** - Page 7 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

2.6 **Sibling contact**: N/A – no siblings under court jurisdiction

2.7 **Child's school**:
☒ The court found that the child should be removed from the home pursuant to RCW 13.34.130(1)(b) and placed into out-of-home care. A placement that allows the child to remain in the same school he or she attended prior to the start of the dependency proceeding ☒ is ☐ is not practical and ☒ is ☐ is not in the child's best interests.

☐ [educational liaison - N/A due to age]

## III. Conclusions of Law

3.1 **Jurisdiction**: The court has jurisdiction over:  ☒ the child
☒ the mother

3.2 **Notice**: The following have received timely and proper notice of these proceedings: The ☒ mother ☐ father ☐ child if 12 or older.

3.3 **Default**: N/A

3.4 **Dependency**: ☒ The child should be found dependent pursuant to RCW 13.34.030.

3.5 **Termination petition**: ☐ A termination petition should be filed pursuant to RCW 13.34.132.

## IV. Order

4.1 **Dependency**: ☒ The child is dependent pursuant to RCW 13.34.030(6) ☐ (a) ☐ (b) ☒ (c).

4.2 **Social study**: ☒ DCYF has conducted a social study, dated __9/21/20__, a report of which was filed and provided to the parties and to the Court.

4.3 **Disposition hearing**: ☒ A disposition hearing has been held.

4.4 **Placement**:
☒ The child is placed in the custody, control and care of DCYF, which shall have the authority to place and maintain the child in:
☐ Relative placement with _____ (name).
☐ Placement with a suitable person: _____ (name).
☐ The home of a person with whom the child's siblings or half-siblings live.
☒ Licensed care:
  ☐ pending completion of DCYF investigation of relative placement options.
  ☒ because there is no relative or other suitable person with whom the child has a relationship and who is willing, appropriate and available to care for the child.
  ☐ because there is reasonable cause to believe that relative placement or placement with a proposed other suitable person would jeopardize the safety or welfare of the child and/or hinder efforts to reunite the parent(s) and child.

Absent good cause, DCYF shall follow the wishes of the natural parent regarding the placement of the child in accordance with RCW 13.34.260.

4.5 **Services**: Services for the mother entered pursuant to RCW 13.34.130 are as follows:

**Order of Dependency (OROD, ORDYMT) -** Page 8 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

[any evaluation must comply with RCW 13.34.370]:

A. **Drug/alcohol evaluation and follow treatment recommendations**
- The parent's compliance shall be based upon making the initial appointment, completing all steps necessary to complete the evaluation, and enrolling in and successfully completing any recommended treatment program. Progress will be verified by reports from the service provider.
- The evaluation completed by the mother at STOP in September of 2020 may satisfy this requirement. If not, the evaluation shall be initiated within 30 days of the date of this order and completed as recommended by the treatment provider.

B. **Random urinalysis 1x/week for 90 days and the Department may request an additional random UA up to 6 times per month upon suspicion of use**
- The parent's compliance with this requirement shall be based upon attendance at all required UAs and consistent negative results. An unexcused missed appointment, violation of program rules, or diluted UA shall be deemed a positive result.
- The parent shall refrain from all legal and illegal intoxicating substance use during the UA period. Any results showing use will be considered a positive UA unless a valid prescription is provided to the collector at the time of collection of the sample.
- Participation in this service shall begin immediately.
- This requirement shall be completed after 90 days of clean, not missed, not diluted UAs.
- Responsibility for payment: The Department, if at an agency referred to by the Department.
- Upon suspicion of use, the Department may request an additional UA, up to 6 per month. The parent shall submit to the UA within a reasonable amount of time of the referral, no more than 24 hours after the request for the UA submission. If the UA request is made by 9:00 a.m. the parent shall submit to the UA the same day unless otherwise agreed by the social worker.

C. **Psychological Evaluation with Parenting Component and follow all recommendations**
- The parent's compliance with the assessment will be evaluated based upon the parent's cooperation in selecting a mutually agreed upon provider in a timely fashion; the participation in and cooperation with the assessment in a timely fashion; and the compliance with recommended services, if any. The assessment may include direct observation of the parent and child together, a parenting and family history, collateral contacts, review of records, and standardized testing.
- The assessment is to be scheduled by the parent within thirty (30) days of the date of this order. The assessment is to be completed within ninety (90) days of the date of this order, as allowed by the schedule of the provider. Any services recommended are to be initiated promptly.
- The Department shall pay for the assessment.

D. **Upon Imminent Reunification: evidence-based in-home parenting service**
- The parent's compliance with the service will be evaluated based upon the parent's participation in and cooperation with the provider's assessment of any support needs to assist in the safe and healthy transition of the child back into the mother's care.
- The Department shall pay for the service.

E. **Cooperate with establishment of paternity**
- Parent is to contact Family Support Division of King County Prosecutor's Office at King County Courthouse, 516 3rd Avenue, Seattle, WA 98104, telephone (206) 296-9020 OR 610 W. Meeker Street, Suite 203, Kent, WA 98032, telephone (206) 296-9595, and

       provide child(ren)'s name and dependency cause number(s). Parent shall provide the prosecutor's office a copy of the shelter care hearing or other court order ordering paternity be established. Parent shall set up and attend paternity interview if requested.
- Parent's compliance with above requirement will be evaluated based on their cooperation with the prosecutor's office; appearance and cooperation in the paternity action; and participation in genetic testing if necessary. Service shall be deemed completed upon entry of a final court order determining paternity. Parent shall keep the Department apprised of status of parentage action.
- <u>Service to begin</u>: upon identification of a specific individual as a potential biological father to the child. Service to be completed: as soon as possible after identification.
- Responsibility for payment: As determined by the prosecutor's office.

☒ DCYF shall provide and the child shall participate in the following examinations, evaluations, or services:
**All necessary medical appointments; continue in therapy as recommended by provider.**

☐ The child is 12 or older and ☐ agrees to the services ☐ was notified of the services ☐ was notified that he/she may request an attorney.

4.6 ☐ Educational Liaison – N/A due to age.

4.7 **Visitation**: ☒ The specific visitation plan between the child and mother shall be as follows:

Two visits per week for 2 hours per visit, supervised by DCYF or designee; visits to occur at DCYF offices.

☒ Visitation between the mother and the child may be expanded upon agreement of the parties.

☐ The specific plan for visitation or contact between the child and child's siblings shall be: n/a – no siblings under court jurisdiction

4.8 **Restraining Order**:
☐ The court entered a separate restraining order pursuant to RCW 26.44.063.

4.9 **Parental Cooperation**: The parents shall cooperate with reasonable requests by DCYF and provide DCYF with income and asset information necessary to establish and maintain the child's eligibility for medical care, evaluations, counseling and other remedial services, foster care reimbursement, and other related services and benefits.

4.10 **Health Care**: DCYF with custody of the child shall have full power to authorize and provide all necessary, routine and emergency medical, dental, or psychological care as recommended by the child's treating doctor or psychologist, subject to review by the court, as needed.

4.11 **Release of Information**: All court-ordered service providers shall make all records and all reports available to DCYF, attorney for DCYF, parent's attorney, the guardian ad litem and attorney for the child. Parents shall sign releases of information and allow all court-ordered service providers to make all records available to DCYF and the guardian ad litem or attorney for the child. Such information shall be provided immediately upon request. All information, reports, records, etc., relating to the provision of, participation in, or parties' interaction with services ordered by the court or offered by DCYF may be subject to disclosure in open court unless specifically prohibited by state or federal law or regulation.

DCYF may continue to make reasonable efforts to locate and investigate an appropriate relative or other suitable person who is available and willing to care for the child, and is authorized to share information about the child, as necessary, with potential relative or other suitable person placement resources to determine their suitability and willingness as a placement for the child.

4.12 **Reports**: DCYF shall submit a report for the next review hearing to the court and to the parties in a timely manner.

4.13 **Termination Petition**: N/A

4.14 **Child's Indian Status:** Any party who subsequently receives information that provides a reason to know the child is an Indian child under 25 C.F.R. § 23.107 shall inform the court.

4.15 All parties shall appear at the next scheduled hearing (see page one).

4.16 **Other**:
☒ The permanent plan for the child is to return home to the ☒ mother ☐ father ☐ other:

☒ DCYF is authorized to consent to travel by the child with their licensed foster parent/relative caregiver/other suitable person placement for up to two weeks within Washington State or to other states within the United States. If the travel will interfere with scheduled visits between the child and a parent, DCYF shall give 10 calendar days' notice to that parent so that a plan for make-up visits can be made. The licensed foster parent/relative caregiver/other suitable person placement may consent to emergency medical and dental care during these trips.

Dated: October 8, 2020.

*/s/ David La Raus*  
Judge JUDITH H. RAMSEYER

Presented by:

*/s/ David La Raus*

David La Raus, WSBA #33715
Assistant Attorney General

Copy Received; Approved for Entry;

_Declined to sign – see attached email_  
Signature of **Mother, Myriam Zayas**  
☒ Pro Se, Advised of Right to Counsel

Signature of Lawyer for the Child's GAL
Jennie Cowan, WSBA # 40323

**Notice: A petition for permanent termination of the parent-child relationship may be filed if the child is placed out-of-home under an order of dependency.** (RCW 13.34.180.)

**Order of Dependency (OROD, ORDYMT) -** Page 11 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

From: M. Zayas <ACZ angel@gmail.com>
Sent: Thursday, October 08, 2020 10:52 AM
To: La Raus, David W (ATG) <david.laraus@atg.wa.gov>
Cc: Myriam Zayas- School <myriam.zayas@bellevuecollege.edu>; Cowan, Jennie <jcowan@kingcounty.gov>; Court, Ramseyer <Ramseyer.Court@kingcounty.gov>
Subject: Re: proposed order for entry following trial 20-7-00666-0 SEA Curnal-Zayas

[EXTERNAL]

F*** you f*** the casa f*** the judge f*** all of you I will never do what you say go f*** yourself and bury yourself in a ditch because you're getting sued all of you are being sued and you're all not going to have a job next year at this time I guarantee it watch I will make sure of it.

> On Thu, Oct 8, 2020, 10:11 AM La Raus, David W (ATG) <david.laraus@atg.wa.gov> wrote:
> Greetings to the Court,
>
> Please see the attached proposed order for entry following the court's oral ruling yesterday. This order has been approved for entry by Ms. Cowan on behalf of CASA. However based upon the response of Ms. Zayas, below, it does not appear that she will agree to sign off on the order, or identify specific disagreements with the contents of the order for discussion by the parties.
>
> Sincerely,
> David La Raus
> Assistant Attorney General
> Division of Social & Health Services, Seattle
> 800 5th Ave. Ste. #2000
> Seattle, WA  98164
> (206) 464-7470
> fax (206) 464-6338
> ************************************************************************************************************
> ***********************************************************
> NOTE:  THIS EMAIL TRANSMISSION IS INTENDED ONLY FOR THE ADDRESSEE SHOWN ABOVE.  IT MAY CONTAIN PRIVILEGED  ATTORNEY-CLIENT COMUNICATION OR ATTORNEY WORK PRODUCT, OR OTHER INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR OTHERWISE PROTECTED FROM DISCLOSURE.  ANY REVIEW, DISSEMINATION, OR USE OF THIS TRANSMISSION OR ITS CONTENTS BY PERSONS OTHER THAN THE ADDRESSEE IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE DESTROY AND NOTIFY SENDER IMMEDIATELY BY EMAIL OR TELEPHONE  AT THE ABOVE NUMBER.  THANK YOU.
> ************************************************************************************************************
> ***********************************************************
>
> From: M. Zayas <ACZ angel@gmail.com>
> Sent: Thursday, October 08, 2020 9:21 AM
> To: La Raus, David W (ATG) <david.laraus@atg.wa.gov>
> Cc: Myriam Zayas- School <myriam.zayas@bellevuecollege.edu>; Cowan, Jennie <jcowan@kingcounty.gov>; Magee, Jamaal (DCYF) <jamaal.magee@dcyf.wa.gov>; Duke, Pauline <Pauline.Duke@kingcounty.gov>
> Subject: Re: proposed order for entry following trial
>
> [EXTERNAL]

YOU TOLD ERIN BOYETT TO LIE ON THE STAND THATS PERJURY AND I HAVE THE PROOF SHE IS BEING SUED, SO ARE ALL OF YOU STOP FUCKING EMAILING ME

From: La Raus, David W (ATG)
Sent: Thursday, October 08, 2020 9:16 AM
To: Myriam Zayas- School <myriam.zayas@bellevuecollege.edu>; 'M. Zayas' <ACZ angel@gmail.com>
Cc: 'Cowan, Jennie' <jcowan@kingcounty.gov>; Magee, Jamaal (DCYF) <jamaal.magee@dcyf.wa.gov>; Duke, Pauline <Pauline.Duke@kingcounty.gov>
Subject: proposed order for entry following trial

Hello Ms. Zayas,

You left the court hearing early yesterday, before the procedure for entering a written order had been discussed.

I have attached a proposed order for submission the court, which has been reviewed and "approved for entry" by Ms. Cowan. That means that she agrees that it accurately reflects what the court has ordered, and the evidence that was presented at the trial.

Since you are representing yourself, please review the order, and then
- if you also approve the order for entry, please sign it and email a scanned copy of the signature page back to me, or
- if you do not approve this order for entry, please specify why not.
<< File: OrdFFCLDpyTrial-CZ.docx >>
Sincerely,
David La Raus
Assistant Attorney General
Division of Social & Health Services, Seattle
800 5th Ave. Ste. #2000
Seattle, WA 98164
(206) 464-7470
fax (206) 464-6338

*********************************************************************************************
*****************************************************************
NOTE: THIS EMAIL TRANSMISSION IS INTENDED ONLY FOR THE ADDRESSEE SHOWN ABOVE. IT MAY CONTAIN PRIVILEGED ATTORNEY-CLIENT COMUNICATION OR ATTORNEY WORK PRODUCT, OR OTHER INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR OTHERWISE PROTECTED FROM DISCLOSURE. ANY REVIEW, DISSEMINATION, OR USE OF THIS TRANSMISSION OR ITS CONTENTS BY PERSONS OTHER THAN THE ADDRESSEE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE DESTROY AND NOTIFY SENDER IMMEDIATELY BY EMAIL OR TELEPHONE AT THE ABOVE NUMBER. THANK YOU.
*********************************************************************************************
*****************************************************************