☐ King West ☐ OICW
☐ West Seattle ☐ MLK
☐ King East ☐ King South West
☒ **King South East**

|  |
|---|
| FOR OFFICIAL USE ONLY<br>Juv. Ref. No:_____ |

| **SUPERIOR COURT OF WASHINGTON**<br>**COUNTY OF KING, JUVENILE COURT** | |
|---|---|
| In Re:<br><br>ACZ<br>dob: ▮▮▮▮▮▮<br><br>Minor Child. | **No**: 21-7-00531-9 SEA<br>[Dependency No. 20-7-00666-0 SEA]<br><br>**Petition for Termination of Parent-Child Relationship**<br>**(PTPCR)** |

## I. JURISDICTION AND PARTIES

1.1 **Identification of the Child:** ☐ male ☒ female

| Name | ACZ |
|---|---|
| Date of Birth | ▮▮▮▮▮▮ |
| Home Address | DCYF Approved Care |

1.2 **Identification of the Parents:**

|  | 1. ☒ **Mother** | 2. ☒ **Unknown Father**<br>☐ presumed<br>☐ alleged |
|---|---|---|
| Name | Myriam Zayas | Unknown |
| Date of Birth | ▮▮▮▮▮▮ | Unknown |
| Marital status | ☒ single ☐ married ☐ other | ☐ single ☐ married<br>☐ other |
| Home Address | ▮▮▮▮ ▮▮▮▮ ▮▮▮▮<br>▮▮▮▮▮▮▮▮▮<br><br>Email: ▮▮▮▮▮▮▮▮▮▮▮▮ | Unknown |

1.3 **Child's Indian Status:**

The petitioner has made the following efforts to determine whether the child is an Indian Child: ACZ

☒ Based upon the following, there is not a reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding:

The mother has denied having Indian ancestry. The identity of the father is unknown, and paternity has not been established. There is no reason to know that the child is a member of or eligible for membership in any federally recognized tribe.

☐ Based upon the following, there is a reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do apply to this proceeding:

☐ The petitioner has provided notice of this proceeding as required by RCW 13.38.070 and 25 U.S.C. § 1912(a) to all tribes to which the petitioner knows or has reason to know the child may be a member or eligible for membership if the biological parent is also a member.

1.4. **Identification of CASA:**

The child's court-appointed special advocate (CASA) is: pending assignment.

1.5 **Paternity:**

The parents are not married to each other. Paternity has not been established. In a prior dependency as to this child (14-7-01695-4 SEA) the mother had identified JC as a potential father, however he was dismissed as a party after genetic testing determined that he was not the biological father of ACZ. No other individual has been identified as a potential father of ACZ and the identity of her father is unknown.

1.6 **Jurisdiction:**

This court has jurisdiction over this proceeding pursuant to RCW 13.34.180 and JuCR 4.1.

1.7 **Servicemembers Civil Relief Act:**

To the best of DCYF's knowledge, none of the parents is a member of the armed services and the Servicemembers Civil Relief Act does not apply to this proceeding.

## II. ALLEGATIONS IN SUPPORT OF TERMINATION

2.1     **Dependency**: The Court entered an Order of Dependency for ACZ under RCW 13.34.030(6)(c) as to the mother on October 8, 2020, following a contested evidentiary hearing. The Court entered an Order of Dependency for ACZ under RCW 13.34.030(6)(c) on August 25, 2020, by default as to the unknown father and/or anyone else claiming a parental interest.

2.2     **Disposition**: The Court entered a dispositional order pursuant to RCW 13.34.130 as to the mother on October 8, 2020, and on August 25, 2020 as to an unknown father and/or anyone else claiming a parental interest.

2.3     **Removal from Parents**: The child has been removed from the custody of the parents for a period of at least six months pursuant to a finding of dependency. The child was placed out of the home by the dispositional orders, which each continued the out-of-home placement initially ordered on or about March 16, 2020. The child has been placed in the care and custody of the Department of Children, Youth, and Families and has remained out of all parents' custody and care since that time.

2.4     **Parental Deficiencies**: Parental deficiencies identified at the time that dependency was established and at subsequent dependency review hearings, and/or permanency planning hearings include:

A.  As to the mother:
- Ongoing risk of neglect due to extensive CPS history.
- Significant history of substance abuse, impairing ability to care for a child
- Ongoing risk of harm due to mental health issues.
- Lack of understanding of child's developmental needs.
- Inadequate parenting skills to provide for the child's emotional, physical, mental and developmental needs.

The current dependency as to ACZ was ordered following trial, based on the following facts found to demonstrate "clear and significant impairment of [the mother's] ability to adequately meet this child's basic physical, developmental and emotional needs" (summarized):

(1) This is the second dependency matter involving ACZ the first (14-7-01695-4 SEA) was based on the mother's agreed fifteen-year history of substance abuse, particularly of

methamphetamines; that case was dismissed in October of 2015 following the mother's participation in services of random urinalysis testing, ongoing chemical dependency treatment, parent coaching, and a neuropsychological evaluation and following resulting treatment recommendations. The mother has also had past dependency actions regarding her older children who are now adults: [MBZ] (DOB: [redacted]) and [JZ] (DOB: [redacted]) were declared dependent in Pierce County in 2009 (cases 09-7-01466-7 / 09-7-01465-9), on the basis that the mother's use of methamphetamines and alcohol impaired her ability to safely and adequately care for the children. The children were placed out of the home; [JZ] was later returned to the mother's care and the dependency as to her was dismissed; the dependency case as to [MBZ] was dismissed after his father obtained custody. [JZ] was declared dependent a second time in 2013 (case 13-7-12094-0 SEA). The mother entered an agreed order of dependency on 3/14/14, agreeing that her continuing use of methamphetamines, despite repeated attempts at engaging in treatment, impaired her ability to care for the child; the mother participated in a drug/alcohol evaluation and follow recommendations, urinalysis testing, and a foster care reunification assessment, but relinquished her parental rights to [JZ] on 1/21/15.

(2) On 2/07/20 before giving to [CZ], Myriam Zayas tested positive for methamphetamines; she had obtained inconsistent prenatal care. [CZ] was adopted at birth. Ms. Zayas reported a history of methamphetamine use starting at age 18, but denied amphetamine use in the past several years and attributed the positive test result to her having taken Benadryl, however she declined to perform a urinalysis test for the Department. The mother subsequently did engage in seven verified UA tests, the results of which included one diluted sample and two that tested positive for amphetamines and methamphetamines. The mother attributed her positive results to her prescribed daily medication, but she did not provide definitive medical evidence that her specific use of the medication would have resulted in false positives. If she had been taking the medications on a daily basis then the results should be consistently positive; also the use of medications would not explain an adulterated result, and the mother had stated she knew how to defeat a UA test for amphetamines. Ms. Zayas asserted at trial that drug use is not relevant to dependency proceedings, however the court found that use of a substance to the point that it impacts the ability to adequately care for a child is a proper basis to find that court intervention is required.

(3) During the prior dependency as to ACZ in 2015, Dr. Connor had performed a neurological evaluation of Ms. Zayas and articulated that Ms. Zayas' problem solving and decision-making abilities could be significantly negatively impacted if she resumed actively using substances; the trial court found a clear difference between the mother's ability to cooperate and engage with the Department and service providers in the prior dependency compared to her refusal to do so in the current dependency proceeding.

(4) When asked to participate in a DCYF meeting to discuss ACZ Ms. Zayas refused in curse-and-insult-filled texts and threated to call police on the social worker for harassment; when asked if she would like or accept any other services from the department, to help address her medical or mental health needs, Ms. Zayas responded "hell no." Ms. Zayas persisted in declining to participate in remedial services offered by the Department. She did obtain a drug/alcohol evaluation in April, which recommended intensive outpatient treatment, but she did not fully complete that treatment. She obtained a subsequent evaluation in September of 2020 that recommended inpatient treatment but she did not participate.

(5) Following the initial shelter care hearing on 3/17/20 the mother was inconsistent in attending available visitation with ACZ despite the Department explaining to her how important it was for the child's emotional welfare for the mother to maintain regular contact with the child; she would also periodically email the Department stating that visits should be cancelled because she would not participate, but then later she would request to participate.

(6) When ACZ attended kindergarten 2019-2020 her teacher Erin Boyett had significant concerns about ACZ welfare during that time, including that ACZ would frequently miss school or be late - more so than the other children - and the mother would report that they overslept or that ACZ didn't sleep well so she was keeping her home to sleep; ACZ frequently arrived to school tired and hungry, and underdressed for cold weather; ACZ frequently mentioned that she could only have limited food at home, would accept any food that was offered to her, and gathered up leftovers from school lunches to take home; the biggest concern was that ACZ was "so emotionally out of control," struggling to appropriately manage her emotions, often presenting "extreme reactions to minor matters;" she would frequently disrupt the class by yelling and throwing things, or hiding under the table and "completely shutting down;" this behavior often resulted after she received any negative feedback (such as being asked wait or not to interrupt), or from

receiving attention when she wasn't ready for it. She needed "lots of nurturing attention" and was "very clingy," and her academic progress was delayed as a result of her poor attendance and her behavioral issues. Ms. Zayas told Ms. Boyett that that at home ACZ would run away from her and hide, and she found ACZ behavior difficult to manage.

(7) Since filing of the dependency petition the mother has engaged in erratic behaviors including going to the DCYF office with police and accusing the Department of kidnapping her child, and after the police left threatening to blow up the office and/or kill the assigned social worker Jamaal Magee if her child was not returned to her; she is also the subject of an anti-harassment order obtained by the initial foster placement for ACZ after Ms. Zayas located the foster home via an application in ACZ IPad, and then threatened to demonstrate outside their home, and then (after the child had been removed from the home due to the mother's behaviors) she began sending the prior foster father accusations though his "Linked-in" account. She has consistently maintained the Department's actions since the birth of the infant ▇▇▇ are unrelated to any concerns for ACZ welfare, but are instead motivated by racism against white women and/or by the Department's desire to obtain federal funding by placing ACZ out of the mother's care. She reiterated those claims at trial but presented no evidence to support them. At trial the mother denied having any parental deficiencies, and also denied basic facts that were clearly established in the record, such as denying that the initial shelter care hearing actually occurred, although she was present, and denied ever using methamphetamines in the past, and asserted that the prior dependency as to MBZ was due to a dog bite, and that the prior dependency as to ACZ was due to the mother losing housing for three weeks, when the actual dependency orders refute all of these claims.

(8) The mother has modeled unhealthy approaches that are not only harmful for ACZ to experience, but that the child has also followed, resulting in emotional fragility and volatility and delaying her progress in school. The mother has also involved ACZ in inappropriate conversation of adult subjects, such as her belief that DCYF kidnapped the child, causing ACZ to become confused and upset. ACZ is too young to self-protect, or to reliably report any problems she might be experiencing in the mother's home that would need remedial attention; this is compounded by the mother admittedly instructing ACZ not to discuss her home life with others, an instruction that ACZ has followed.

All of the above deficiencies impair the mother's ability to safely parent.

B. <u>As to an unknown father / anyone else claiming parental interest</u>:

- Demonstrated lack of commitment to parenting responsibilities by failure to come forward, establish paternity, participate in the child's life and establish a relationship with her.
- Uninvolved in dependency matter and not participating in court ordered services to remedy parental deficiencies, or in visitation with the child.

2.5   **Services to Correct Parental Deficiencies**: Services ordered under RCW 13.34.136 have been expressly and understandably offered or provided, and all necessary services, reasonably available, capable of correcting parental deficiencies in the foreseeable future, have been expressly and understandably offered or provided as follows:

A.   <u>As to the mother</u> - The Department filed a dependency petition on ACZ and an initial shelter care hearing was held on 3/17/20.  The mother was represented at that hearing and contested the need for out-of-home placement for the child.  Following a hearing the court ordered that ACZ be placed in licensed foster care.  At the hearing the Department recommended that the mother engage in remedial services including drug/alcohol assessment and follow recommendations, random UA testing, mental health evaluation and follow recommendations, and a parenting assessment and follow recommendations.  The mother did not agree to having any services ordered at that hearing.  As part of the dependency order following trial the court ordered the mother to participate in remedial services of: Drug and alcohol evaluation and follow treatment recommendations; random urinalysis one time per week for 90 days (an unexcused missed appointment, violation of program rules, or diluted UA shall be deemed a positive result); psychological evaluation with a parenting component and follow any recommendations; cooperate with establishment of paternity; in the event of imminent reunification, mother shall participate in an evidence-based in-home parenting service.

The mother partially completed her psychological evaluation with a parenting component with Steve Tutty, MA, Ph.D..  In his report dated December 11, 2020, Dr. Tutty

also recommended services for the mother including: (a) that the mother consult with her neurologist and undergo diagnostic imaging to determine if functional impairments exists and regarding psychotropic medications; (b) establishing a working therapeutic relationship with a therapist approved by the Department that is skilled in both cognitive behavioral treatment, as well as dialectial behavioral treatment;  (c) complete Intensive Outpatient Treatment for methamphetamine abuse followed by sober support services; (d) prior to considering reunification, Dr. Tutty recommended that the mother complete a parent child observation with him to assess the parent-child bond and to better determine the mother's overall parental fitness.

The Department has repeatedly made efforts to offer all of the above services and give service referrals to the mother for this current dependency, in addition to having done so in her previous dependency actions involving this same child and the child's older siblings. During the current dependency the Department has regularly mailed the mother service letters outlining her court ordered services, and communicated with her concerning services verbally and by text and email. The mother communicates with the Department via correspondence with multiple text messages and emails nearly daily.  Other times she will tell the Department not to communicate with her any more, but then will resume texting and emailing the social worker.  She has repeatedly asserted that she will not engage in any services, because she maintains that the order of dependency and the shelter care order entered prior to that are not legally valid, including that the shelter care hearing never occurred and the resulting order is a "forgery," and that the dependency order is invalid because she refused to sign it. She also asserts that the dependency order resulted from racial discrimination by DCYF and the court against white people.  Her communications are often combative, antagonistic, threatening and abusive. On December 10, 2020, an Order Prohibiting Derogatory Communications was entered in the dependency proceeding, prohibiting the mother from communicating with the Court, all parties and witnesses in a profane manner; the mother has disregarded the order and persisted in these types of communication.  The mother has not requested additional services of the Department, and the Department is not aware of additional services that would be appropriate.  The Department remains ready and able to continue to offer any necessary and appropriate remedial services to the mother if she will agree to engage in them.

B.  As to an unknown father, and/or anyone else claiming a paternal interest:

The court ordered that any unknown father shall establish paternity, and participate in a parenting assessment and follow any resulting service recommendations. The court ordered that DCYF shall further assess any unknown father for service needs once that person comes forward or is located.  To date no unknown father has come forward. The Department remains willing to continue to offer and refer services to an unknown father should that person come forward and express an interest in the minor child.

2.6   **Mother's Engagement in Services**:

The following information has been verified by DCYF; the mother has asserted some additional participation in services, but the Department has been unable to verify her participation in those services because - in violation of the order of dependency and dispositional order - she has refused to sign releases of information for the providers to communicate with the Department.

(a) *Drug and alcohol evaluation and follow treatment recommendations*: The mother has been referred for a substance abuse evaluation, including to Social Treatment Opportunity Programs (STOP) located in Kent, Washington, but she reports that providers will not accept her for treatment because she denies any current substance abuse.

(b) *Random urinalysis testing weekly for 90 days*: The mother has sporadically engaged in UA testing at Social Treatment Opportunity Programs, however she has missed many UAs and has had some results that were positive for methamphetamines; she has attributed these results to taking a prescription medication, Labetol, but has not provided information about how much she takes or how often she takes it, as would be necessary for a doctor to determine if the results were in fact due to her medication and therefore not positive for controlled substances.  She has not completed a 90-day period of weekly UA testing with no positive, diluted or missed results.

(c) *Psychological evaluation with a parenting component and follow all recommendations*; The mother engaged in this evaluation with Dr. Tutty, resulting in the service recommendations for the mother referenced in para. 2.5 above. Due to Covid-19 mandates at that time the parent-child observation component could not be competed to assess the parenting domains of safety, her behavior toward the child, teaching and training issues, behavioral control, and child-initiated behavior.  She informed Dr. Tutty that she was diagnosed with bipolar illness at the age of 13 and prescribed lithium until the age of 18; she reported that she continues to suffer from bipolar illness but no longer takes medication to manage this condition.  She reported methamphetamine use starting at age 18 and confirmed it became habit forming until she reportedly stopped use in February

of 2020. She scored below average in executive functioning; her Personality Assessment Inventory test results were invalid; she endorsed a normal level of depression and anxiety; her Anger Expression and Anger Control test results were "very high;" her Child Abuse Potential Inventory results were invalid, but her Adolescent Adult Parenting Inventory-2nd results did not indicate high risk parenting attitudes and behaviors. She was diagnosed with Methamphetamine Use Disorder, and a provisional diagnosis of Bipolar Illness – severe with observed traits of grandiosity, entertaining beliefs that typically are not supported by evidence, a high level of paranoia that creates challenges in trusting the intentions of others, as well as hypervigilance and aggression. Dr. Tutty concluded that in the mother's identified clinical and parenting deficits interfered with her ability to provide children with a predictable, stable, safe, adequately structured, and consistently nurturing home environment, and therefore she remained at high risk toward adversely affecting the safety and welfare of children in her care. Dr. Tutty provided service recommendations referenced above, but noted that the mother did not appear to be amenable to treatment services given the high level of distrust, untreated bipolar illness, and adverse impact of methamphetamine abuse.

(d) *Cooperate with establishment of paternity*; not applicable – no person claiming paternity has come forward or been identified.

(e) *In-home parenting service*: not applicable - service ordered to take place upon reunification, which has not occurred.

(f) *Consult with a neurologist*: the Department has repeatedly encouraged the mother to consult with her primary care provider and insurance to obtain an appointments with a neurologist for the recommended diagnostic imaging and psychotropic medication consult, and has requested information about her provider and insurer for this purpose, but she has not responded.

(g) *Mental health therapy*: the Department has informed the mother of the specific requirements of that therapy (with provider skilled in both cognitive behavioral treatment and dialectical behavioral treatment) and has offered to refer her to several providers for that service, but she has not attended.

(h) *Intensive Outpatient Treatment*: See section (a) above. Prior to engaging in IOP the mother would need to have an evaluation from a substance abuse provider affirming the need for that service, but Ms. Zayas has not obtained that evaluation.

(i) *Parent-child observation session*: Dr. Tutty indicated that this should take place prior to reunification being considered; the case has not reached that point but the Department has provided the mother with Dr. Tutty's contact information or to facilitate contact if she wished to engage in that session.

(j)     *Services in prior dependency cases*:  in her prior dependency cases the mother has been offered and/or has participated in: drug/alcohol evaluations, intensive outpatient treatment, urinalysis testing, mental health services, parent coaching, a foster care reunification assessment, and a neuropsychological evaluation and recommended treatment (substance abuse treatment, mental health counseling and psychiatric evaluation to address diagnosed difficulties in maintaining/switching attention, memory and anxiety/depressive symptoms).

2.7     **Father's Engagement in Services**:

No father is named on the child's birth certificate.  Dependency was established by default as to an unknown father and/or anyone claiming paternal rights or interest in the child.  The dispositional order provided that services would be provided and further assessed if and when a person identifying themselves as a father/claiming a parental interest came forward. No such person has come forward to establish paternity, engage in services, or develop a relationship with the child.

2.8     **Little Likelihood of Return Home in the Near Future:**  There is little likelihood that conditions will be remedied so that the child can be returned to her parents in the near future. Throughout the dependency the parents have demonstrated an unwillingness to participate in and/or successfully complete services offered to correct parental deficiencies.   The parents have failed to substantially improve their parental deficiencies in the 10 months following the entry of the disposition order.

No person has come forward to express a paternal interest in the child or to establish paternity.  The mother has not made any changes to her behaviors or demonstrated any improvements in her ability to adequately care for the child, since the time that the child was initially removed from her care 17 months ago.  The mother consistently refuses to acknowledge any parental deficiencies, and consistently refuses to participate in services when offered or discussed.  The mother's focus is on perceived injustices rather than meeting the needs of her child: she continues to inaccurately challenge the legal validity of the dependency order, and the preceding shelter care order, and to dedicate her efforts towards filing lawsuits against multiple persons even tangentially involved in the current dependency case or in the care of her child, and communicating various accusations against those individuals.  This contrasts with the first dependency as to ACZ in which the mother participated in the agreed ordered services and the child was returned to her care and the case was dismissed.  She has also fired her multiple court-appointed attorneys in the

dependency case.  Dr. Tutty recommended that parent-child visitation continue to be supervised, however the mother's visitation with the child has been repeatedly interrupted when she loses contracted visitation supervisors due to her hostile and antagonistic interactions with them.  Other examples of failing to prioritize meeting her child's needs during the course of this dependency include her claiming that "COVID is fake" regarding the need to protect the child during visits, and demanding that ACZ be removed from a private religious school where she was making progress academically and socially - even though the child could be exempted from religious education - and then stating that she was informing every public school that she would sue them if they enrolled ACZ and demanding that ACZ instead be home-schooled by the mother during their limited weekly visits.

For all of the above reasons, the parents do not understand and are incapable of providing for their child's emotional, physical, mental, and developmental needs.  The parents are incapable of safely parenting the child, and remain currently unfit.

2.9     **Continuation of the Parent-Child Relationship:**   Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. The child is adoptable and has prospects for adoption.  The child cannot be adopted unless parental rights are terminated.

2.10    **Best Interests of the Child:**  Termination of parental rights is in the best interest of the child. The parents will not be able to remedy their parental deficiencies within the near future.  The child has the right to be raised in a permanent, stable home environment under the care and custody of emotionally stable, nurturing parents where the child will be provided with adequate food, clothing, shelter, medical care, education, and a secure place in the community, all of which have not and will not be provided by the parents.

### III. RELIEF REQUESTED

Based on the foregoing allegations, petitioner requests entry of orders of this court as follows:

3.1     **Termination of Parental Rights:**  Petitioner requests that the parental rights to the child be terminated pursuant to RCW 13.34.180-.210 inclusive.

3.2    **Custody of Child:**  Petitioner requests that the child be committed to the care, custody, and control of the Department of Children, Youth, and Families, State of Washington, for the purpose of placing the child for adoption, or in the absence of an adoptive placement, in a licensed foster home, or taking other suitable measures for the care and welfare of the child pursuant to RCW 13.34.210.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this ___11th___ day of August, 2021, in Seattle, Washington.

_____
**JAMAAL MAGEE**
DCYF Social Worker