1  M. Zayas
   Kent WA 98030
2  +13606021444
   amiya.angel@gmail.com
3

4  # UNITED STATES DISTRICT COURT
5  for the

6  WESTERN DISTRICT OF WASHINGTON

7

8  ZAYAS, MYRIAM;                          Case No.: 20-CV-00650

9  (

10 V.                                      1. Section 42 U.S. Code § 1983;
                                           2. PERJURY
11 DEFENDANT(S).                           3. INTENTIONAL INFLICTION OF
                                              EMOTIONAL DISTRESS;
12 DEPARTMENT OF CHILDREN, YOUTH &         4. 4TH AMENDMENT VIOLATION
   FAMILIES (DCYF-CPS)                     5. 14TH AMENDMENT VIOLATION
13 OWENS, KELSEY  (KO)
   DECAMP, JULIE (JD)
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURISDICTION

1. This Court has original jurisdiction over claims brought under 42 U.S.C.§ 1983,

2. Venue is properly located in the Western District of Washington at Seattle under 28 U.S.C. § 1391(b). The incidents written about in this complaint occurred in King County, Washington and some or all of the defendants are residents of King County, Washington.

3. Standard tort claim filed by Plaintiff to the Office of Risk Management two separate times regarding past CPS issues, and current CPS issues. Over 60 days has passed.

# PARTIES

1. Myriam Zayas (hereinafter "Plaintiff" and before under previous page) is a resident of King County and resides in King County Washington, she is the birth mother and sole provider for the minor child involved. She is also the mother of 2 other children, 1 living with her, the other adopted by strangers in 2014.

2. Child Protective Services (hereinafter "CPS" and before under previous page) is administered through Administration's Department of Children and Family Services, which is one of the administrations under DCYF Department of Children Youth & Family's.

3. Defendant Julie DeCamp (hereinafter "JD") is a Child Protective Services Supervisor and, upon information and belief, a resident of King County, Washington, which is in the Western District of Washington. *In her individual capacity*

4. Defendant Kelsey Owens (hereinafter "KO") is a Child Protective Services investigator and, upon information and belief, a resident of King County, Washington, which is in the Western District of Washington. *In her individual capacity*

# JURY DEMAND

5. Plaintiff hereby demands a jury pursuant to the Seventh Amendment of the

6. U.S. Constitution and Fed. R. Civ. P. 38.

# FACTS

1. Myriam Zayas (Plaintiff) lives in the city of Kent, located in King County Washington. She is the mother and sole provider for a 5 year old child.

2. 2009-2015 Plaintiff endured a 6 year dependency CPS collected Title IV-E for a significant amount of time on both children, justifying the prolonged dependency. Judge Beverly Grant was openly racist and favored the black men in her case granting both custody despite documented evidence of physical abuse, and documented evidence of unfitness.

3. 2012-2015 Plaintiff lost custody of her 2 oldest children to abusive fathers, they were raped, beaten and abandoned one was removed by the sheriff adopted by foster parents for the adoption incentive bonus given to the social worker that completes an adoption. The other came back home to his mother after being abandoned at the age of 14.

4. Both of her oldest children will become parties to this claim no later than Jan 2020.

5. On February 9th 2020 Plaintiff gave birth to a healthy 7 pound baby girl. Unfortunately she felt as if she would not be able to keep the baby. CPS investigator KO had been in touch with the plaintiff a number of times before and throughout her entire pregnancy, for this reason the Plaintiff secured adoptive parents. She did not want to risk losing both children via CPS picking up the newborn. Normally if they take one, they will take them all. She risked losing both, or just one voluntarily. The only allegation KO had through the pregnancy was that her doctor called KO and supposedly reported a dirty drug screen, she would find out after giving her child away, that Kelsey was lying, and using this as an interrogation technique. An attempt to get the Plaintiff to admit to using drugs. This would be ok in a criminal case however when the case involves a protected liberty interest perjury is not permitted. KO committed perjury at the FTDM which is considered a hearing of some sorts stands for ( Family Team Decision Meeting). While attending there were 2 other workers who confirmed that they too knew of these dirty drug screens. It was all a lie.

6. 10 days after giving birth Plaintiff was hospitalized for congestive heart failure at the age of 39. This was by far the most bitter pill to swallow. Especially since she had been clean throughout and before the pregnancy for some years. Her initial worry was CPS detecting marijuana in her drug screen. Marijuana may be legal but to CPS dirty is dirty especially with a parent that has a prior case. She quit smoking cigarettes over a decade ago, so she wondered how this could have happened. Consulting with her cardiologist he explained that stress of course does cause high blood pressure; however for it to cross over into critical heart disease or failure it must occur chronically for a long period of time. Plaintiff concluded that her 20 year history running from social workers, losing her children unfairly while they made fun of her and called her names. Losing child after child, yet never putting a finger on them as far as abuse. Prior to this pregnancy her clean date was 2014, before the child KO removed in March was even born. However the stress during pregnancy was the drop that made the bucket over flow. And her pregnancy consisted of far more stress from CPS than anything else. Her age is also taken into consideration being 39 having children can be risky. However losing her 2 oldest to their fathers and then their fathers abusing them in two separate cases that dragged on over 6 years of her life, adding huge time spans of chronic stress. Followed by many years of social workers contacting her for no reason without any evidence at all to remove any child just based on hearsay. Plaintiff believes that CPS may not have directly caused her condition but she knows for sure they played a part in it and an unfair part they played, taking advantage of her lack of knowledge on civil rights.

7. Plaintiff assumed KO would have some type of sympathy for her giving the child up for adoption and be grateful that her newborn has a wonderful future ahead, instead of being upset accusing the plaintiff of selling the child and taking her 5 year old 4 weeks later without a warrant and, without exigent circumstances or imminent danger. After Plaintiff attended the FTDM where KO committed perjury, Plaintiff agreed to take drug screens for the next 4 weeks.

8. Plaintiff passed a total of 17 drug screens in all except for the second one March 5th 2020, which occurred when her medication dose was elevated by her doctor. When KO told her it was dirty on March 13th Plaintiff went right to assuming KO was lying again trying to interrogate her. Plaintiff had not used there was no way it could have been dirty. She was highly upset and told KO if she had known her pee was dirty she would just drink baking soda and clean it. But that she would never deliberately do something like that. This made KO even more upset. She became so upset that she removed Plaintiffs child for revenge. How is the Plaintiff supposed to believe that drug screen was dirty when she lied about 5 being dirty, when there was really 0 that were dirty? How is it okay for a social worker to lie to interrogate but that same social worker expects the parent not to lie? You can't fight fire with fire, you have to fight it with water, meaning the truth not a lie.

9. At no point did KO truly believe the Plaintiffs daughter was in danger she knew her daughter was not in danger. KO has been following the Plaintiff around for over a year, she had been in her home a number of times, she met her son the year before. She saw her before she went in the hospital after having the baby. On Feb 20-21, 2020 KO refused to pick up her daughter while Plaintiff was in the hospital sick and requesting voluntary placement. Remember this was after she had already given the baby up for adoption, why would she come her goal was not the 5 year old it was the newborn. That confused the Plaintiff, the one time she calls CPS to come pick her child up, and they tell her no. The social workers that worked at Auburn Hospital in the mom and baby unit can attest to this because Plaintiff consulted with them on why KO refused to pick up her child. KO acted with deliberate indifference when she could care less that the 5 year old child almost lost her mother, was forced to witness it, while in the same room as her mother without a babysitter to watch her, Room 343 Auburn Hospital Mom & Baby Unit, Plaintiff had to be drained of fluids resulting from high blood pressure her heart became 2x its normal size and now has B-lines. This is what occurs when someone has CHF. 10 days prior her daughter watched her baby sister be given away to another family. Upon returning home

from the hospital Plaintiff found her daughters' pet guinea pigs had passed away due to her long hospital stay, and no one to come feed them. This made the Plaintiffs daughter extremely upset, the adopting dads bought her a puppy to cheer her up and she loves this puppy. Plaintiff also bought her 2 new guinea pigs to replace the ones that died. She spent just a few weeks playing with this puppy and her new guinea pigs. KO removed a perfectly healthy happy child with no proof of child abuse at all. KO used a copy and pasted dependency from 2001 in her version of a dependency petition to remove Plaintiffs daughter from daycare at 11am, 3 hours later at 1:49 pm she then filed the motion in court. The second signature stated to be that of a judge looked like to the Plaintiff a stamp or drag and drop signature, meaning forged. Upon further investigation Plaintiff found out it doesn't belong to any judge that she could find. Removing a child with no court order is fine but removing a child with a forged court order is still forgery.

10. When tending to their allegations one would wonder why this would equal such a destruction of civil rights. Nothing she did wrong was out of the ordinary or uncommon. At no time prior to any of her children ever being removed were her children physically, mentally, or emotionally hurt in any way. The only pain caused was the loss of their mother, habitat and sibling that always occurred after a time when CPS claimed to have it under control always claiming that this had to be done to avoid any further damage. Hence no proof of damage was ever given. The social worker future predicting is now prohibited after a few words were changed in the Revised Code of Washington just a few days ago: abuse MUST have ***"already occurred"*** for it to even be reportable. ***Changed on June 1, 2020 .*** Plaintiff speculates that KO likely was aware of this law change because Plaintiff text her the revised code in detail to remind her that in June she would have to leave the Plaintiff alone with her future predicting.

11. She in fact still has this communication and is convinced that their reason for removing her child is strictly for funding purposes. Especially since she knew lock down was coming and was in such a hurry that she forgot some very important legal steps that are required for the parent to have, such as proper warrant and removal paperwork, prior to removing the child. As

well as exigent circumstances, or imminent danger at the time of the removal. These two steps were vital in her case standing in federal court should she be held liable for a warrantless removal that did not contain any required characteristics for her actions to be permitted. In this case the only paper evidence provided was a false positive drug screen, where in fact the social worker was able to name the drugs in the Plaintiffs drug screen. The theory of the drug screen coming up positive fell under 2 theories the Plaintiff came up with after some research. One is that CPS named the drugs the other is that it could have been her medication:

   a. Plaintiff was aware that when CPS paid for their urinalysis drug screen many times they only paid the least amount required to complete the test. When paid the least the lab only reveals that there is in fact something in her urine, they can even state how many different things are in her urine. But CPS needs to actually pay more to find out the name of the substance in her drug screen. This is why it is important for people to abstain from using *any* substances prior to testing, or writing down the medication they are on so the lab can rule out it being the medications the person is on. Hence subtracting the likelihood of it being the substances listed by the patient.

   b. A correct full drug screen would have concluded traces of marijuana and Seroquel (prescribed by her physician) which would have shown as a barbiturate and THC, of which neither was detected. They are paying for a $45 drug screen versus a $60-90 drug screen. Having to guess what the substance is and name it accordingly without looking like they just did, when opting with the $45 screen could have been the case.

   c. When Plaintiff went for her initial drug screen she was just released from the hospital and had her medication dosage elevated a number of times due to complications arising from her elevated blood pressure. Some nights Plaintiff did not need to take her Seroquel and would often be stuck upstairs unable to walk downstairs where she had to keep her medication out of reach from her daughter.

    d. The night when KO took Plaintiffs daughter she proceeded to Google all of the new medications prescribed, and found that the one she was taking the highest dosage at the time was in fact listed on the FDA government website, as a drug that caused false positives for what she was being accused of. When she asked KO to retest the same sample as it says to do on FDA website in order to rule out false positive KO immediately shakes her head stating the sample is gone, if it's positive why is it gone? Likely because they went the cheap route and don't want anyone to see it.

12. The RCW code states that drug use holds great weight, it does not say remove child even if parent claims it's medication. Holding great weight does not mean remove the child. The Judge at the shelter care hearing March 17th 2020, refused to allow Plaintiff to speak, towards the end of her only hearing she would have for months states "Bring in the note from your doctor." Plaintiff was upset but determined. Especially after she found out her doctor could not see her right away due to COVID-19 and wanted to see her to have her drug tested prior to giving her such a letter. It would not be until the 23rd of March that Plaintiff would get this letter from her doctor. Upon submitting the letter to the courts and her lawyer who asked for it as well, nobody did anything as far as apologizing or bringing her daughter home. They did not have to the damage was done. They have what they came for throughout the lockdown.

13. The entire time from the day her daughter was taken she was not able to speak to, hold or touch her 5 year old daughter for 6 weeks straight. (To this day she still has not held or touched her daughter it has been 3 months. ) KO was very aware this would happen. She handed the Plaintiff a list of resources that would help pay her rent if she had trouble. This was confusing. Especially since KO knew she was on Section 8 and would not need such a list. Plaintiff still did not understand the events were planned meticulously by KO and her supervisor JD.

14. Plaintiff begged JD to please call on the phone her daughter so she could please speak to her just on the regular phone, JD refused for the first 6 weeks. Her child was placed in a

PAGE **9** OF **20**

20-CV-00650 CIVIL RIGHTS COMPLAINT

house full of strangers (boys) never told anything about why she was placed there she thinks to this day her mother does not want her because she has not picked her up yet. JD excuse was her visits had to be monitored. CPS has to get paid for visitation if they were going to communicate no exception to this rule. Plaintiff had no camera phone KO & JD gave her 3 gift cards and even paid for a phone for her to do visits with her daughter, **6 weeks after taking her**. this is against their policy. CPS has NEVER purchased anything for the Plaintiff in the entire 15-20 years they have been harassing her accusing her of neglect. Not one time, have they ever taken their money and purchased anything for the Plaintiff. Except a bus pass when she was homeless in 2009 to get to her visits that CPS was paid to monitor. Plaintiff was required to go to inpatient treatment in 2009, CPS never offered to pay for it. But court ordered it for her to regain custody. She had no health insurance because she had no kids. They still did not pay for it. She lost custody of her daughter for taking too long, to foster parents unrelated to her daughter when she was sober parenting another child. 2014

15. When a child receives Title IV-E the social worker is officially working to have that child adopted therefore they are not allowed to fund any services that would reunify the biological parents with that child, it is strictly prohibited in the Adoption and Safe Families Act of 1997. They can only refer out to services but cannot pay for them. This is why they only paid for the drug assessment in April 2020 for the Plaintiff, but did not pay for outpatient treatment. Because they want to confirm Plaintiff is an addict but in no way help her stop being an addict. They pay for drug tests but will not pay for drug treatment, because they want to confirm her mistakes not her success. They just need that confirmation for when its time to terminate the Plaintiffs rights, which they have to run concurrent with adoption of the child in order to receive any funding from Title IV-E.

16. What does this mean? Basically Plaintiffs daughter was placed in a home where the foster parents are in it to adopt a child not foster children. This is the way to adopt quicker they call it Foster to Adopt. It is a requirement that they petition to terminate the parents' rights as

soon as that child begins receiving Title IV-E. They also list the average time to complete an adoption as 18 months, CPS is allowed to terminate after 15 months. Running termination and adoption concurrently gives the biological parents no chance. While at the same time making the adoptive parents get more excited with each day that passes, the real parents get more depressed with each day that passes not having their children. Guilty until proven innocent. CPS stalls postponing court dates, prolonging services, requiring ridiculous services, not paying for any of them. After 15 months the courts look at the biological parent and the paying/paid foster family and makes their decision. If they give the child back to parents no more funding. This funding also pays a percentage of the salary for the judge, lawyers for parents and state, social workers, court reporters, bailiffs all the way down to the police officer who took the child. If they let adopting family adopt they are paid an "adoption incentive bonus" for finalized adoption. The foster parents will have to pay a fee for adopting that child depending on the age of the child. Never under $10,000 all the way up to $40,000 for a newborn. Foster children available for adoption online www.nwae.org, only the government is allowed to profit from selling children.

17.     Plaintiff believes that governors of all states are very aware of how Title IV-E works so of course why wouldn't they cut off visits from blood relatives, they too are hoping to break the bond between biological family's.  While at the same time strengthen the bond that child has with wishful adopting parents. Women who have newborns this is a time when bonding is REQUIRED, the government doesn't care they get more money if they sell the newborn to an adopting family. If a newborn is in a foster home receiving Title IV-E, those parents want to adopt that child, and likely have no clue that the biological parent was just a victim of a huge civil rights violation. This has been happening since 1997 right under our noses. Plaintiff wonders if people are protesting for the wrong reason if they knew the numbers for how many African American children are adopted by white families each year, and pay for that baby to their own government. They would be uphauled, and some who are aware are hopefully taking action to fix it. Remember most of these families are not aware of their rights under the US

Constitution. Plaintiffs daughter is African American, and she was unaware of her rights until recently.

18. Since this happened she met a mother way on the east coast, whose 4 children were removed for nothing but mold on the ceiling, none of the children were abused. How is she supposed to fix such a complex costly problem she can't even reach, and what services are required when that happens? Why couldn't CPS just pay to have it cleaned and solve the problem? Because they are not allowed to fund the biological parents in any way. They are adoption motivated in all 50 states due to Title IV-E funding.

19. KO and JD severed the bond the Plaintiff and her child had that was so strong especially after losing her other two children to a racist Judge Beverly Grant. KO forced her child into a foster home that is "licensed", despite having placement all in order to profit from Title IV-E. Plaintiff signed up for outpatient services at STOP treatment in Kent, WA, on her own April 2020 without being asked. She has been attending online classes via Zoom 3 hours a day 3 days per week. She also scheduled her drug assessment herself without being court ordered or asked to do so by the social worker. She completed over 10 drug screens after her daughters removal that were all clean considering she would not take her medication on days she knew she had to test, for fear it would come up dirty again, and would test herself to make sure it was clean prior to testing at her treatment center. To confirm it was clean she would audio and video record herself performing a drug screen at home. Just in case the social worker lied again for what ever reason in the future. Plaintiff also completed mental health assessment at Therapeutic Health Services in Kent, WA and has been seeing her counselor weekly by phone. As suggested by her assessment.

20. KO was performing a proprietary function, acting for financial gain for herself, by placing Plaintiffs daughter in a licensed foster home. JD was doing the same by leaving her daughter in a foster home for profit, even after they both had other placement options presented to them, choosing the bonus incentives via Adoption and Safe Families Act is what happened. If

the harm happens due to the government's implementation of the plan, then there is not immunity. KO & JD carrying out duties provided by the Adoptions and Safe Families Act Policy 1997, while working for the government, has caused an immense amount of grief to Plaintiff and her 5 year old child with no regard to their feelings. By separating them for a substantial amount of time.

# COUNTS

a) **Count 1.** 42 U.S. Code § 1983: Plaintiff was silenced at her shelter care hearing not allowed to speak at all March 17th 2020. KO was allowed to speak for a very long time after removing the Plaintiffs child without probable cause, without exigent circumstances or imminent danger, using her badge acting under the color of state law. 30 day shelter care hearing denied due to lockdown. Plaintiff was denied declaratory decree when she requested a new judge, and was denied. She requested to go pro se and was also denied, courts forced her to take a lawyer after 3 months of erased court dates. Plaintiff asked for an administrative hearing via text and email more than a dozen times. JD claimed she had no idea what an administrative hearing even is, she is a CPS supervisor. However the possibility of not being able to have these hearings maybe COVID-19 related which is another reason that KO and JD should never have removed the child during lockdown. How can the Plaintiff properly fight her case when no attorneys are even at there office to be hired, or consult with?

b) **Count 2.** Perjury: KO stating that Plaintiff had given her physician 5 dirty drug screens at the Family Team Decision Meeting, her physician stated he never contacted CPS and that it would be illegal for him to do so. Drug test results collected while receiving medical care are not to be used for legal purposes, they are used for medical diagnosis and treatment only.

c) **Count 3.** Intentional Infliction of Emotional Distress: KO and JD deliberately removed Plaintiffs child knowing they were on lockdown, and that she would not have any visits for months to come. Despite their knowledge, and Plaintiffs lack of knowledge they continue to hold her daughter hostage going on 3 months no physical contact whatsoever. They left her child thinking that her mother abandoned her when her child asked her "Mom why haven't you picked me up yet?" CPS does not allow Plaintiff to

answer they just cut off the video visit, keeping her upset with her mother. She is only 5 years old and cries every single visit, begging her mom to come home, Plaintiff is not allowed to say she will be home soon, they cut the video off when she says anything like that. Her daughter has no clue this was not her mothers choice, she thinks her mother abandoned her and CPS keeps it that way so her daughter will bond with the adoptive parents and not her mother. This is sick and twisted. These people should be jailed for attempting to sell poor people's children.

d) **Count 4.** 4th Amendment: Not having the proper warrant prior to removing the child, and not filing the paperwork until after the child was already removed. Not having what is required by law prior to removal, exigent circumstances or imminent danger. Proving only a dirty drug screen that was contested by the parent and denied fully. Stating the parent "might die" all parents might die, her child is old enough to call 911 and she knows how to call 911. Plaintiff has no history of "death". KO's position is social worker not fortune teller. ***Illegal search and seizure is a violation of Plaintiffs 4th amendment right to be secure in her property.***

e) **Count 6.** 14th Amendment: KO and JD even after receiving the note from Plaintiffs doctor as requested they still have not made any attempt to even tell the Plaintiff her daughter would be coming home. They started talking about services Plaintiff has been clean for 5 months. Plaintiff is being deprived of her life, liberty, and property due to not having proper counsel that is not paid for by adoption funding, also by being separated during a mandated lock down where KO and JD were told by the Washington state Governor not to remove children unless it is a life or death emergency. Stay Home Stay Healthy Order stated only cases where the motion was filed prior to March 13th would be heard after March 16th 2020. Unless there was an emergency where the parent lost housing, electricity, food etc. ***The 14th amendment states that the parent be in the care, custody, and control of their child.*** Plaintiff is the only parent of this child.

Plaintiff has not touched, hugged, chased, played, held, comforted, kissed, fed, slept in the same bed, kept warm, nurtured her child, even during their required invasive medical exam which was performed on her child after removal because KO called Plaintiff and told her she would be taking her daughter to the doctors when Plaintiff said "Why she just went last week?" KO stated its protocol meaning they do it to all children as a precaution. They performed a medical exam of Plaintiffs daughters private area without Plaintiff present that is a violation of the Plaintiffs *14th amendment right to be there and comfort her child prior to and after the exam is performed.*

# INJURY

21.     By virtue of the foregoing, Defendants subjected Plaintiff to intentional discriminatory treatment based on her income, employment status, and gender, in violation of the Fourteenth Amendment of the U.S. Constitution and of 42 U.S.C. §§ 1981 and 1983.

22.     As a proximate result of the defendants' intentional discrimination, Plaintiff has suffered damages which include: anxiety, nervousness, guilt, frustration, insomnia, bitterness, fear, shame, humiliation, heartbreak, worry, sadness, depression, high blood pressure, weight loss, hair loss, memory loss, hallucinations, anger, resentment, numbness, loneliness, disorganized, post-partum depression, confusion, despair, petrified, terrified, unsettled, apprehensive, distressed, restless, furious, annoyed, livid for the first 42 days after her daughter was removed

23.     Defendants by their above-described actions, intentionally, or with reckless indifference to the well-being of Plaintiff and her 5 year old child inflicted severe emotional distress upon her.

24.     Plaintiff directly suffered from emotional distress due to KO & JD repeatedly violating a number or rights granted to the Plaintiff under the US Constitution and Bill of Rights. These injuries were a direct result from the Defendants actions and no other person could have had the power they have in order for these events to take place. No other person or state can profit from the Plaintiffs child legally besides her own state government, and/or government employees.

25.     Plaintiff suffered from a great deal of repeated injuries that were a direct result of the state policies being carried out by state actors who were all employed by CPS. which include emotional distress after her previous children were removed and kept away from her while the state collected Title IV-E funding, 2 years 2001, 6 months 2003, 6 years 2009, 1 month 2014, and 3 months 2020. The only one of these 5 removals that was legal and permissible fair on its face, was the one from 2001, the rest were unfair and a rights violation, including 0 imminent

danger or exigent circumstances, most based on hearsay evidence only. The state employees were directed by CPS to perform these duties, creating an atmosphere geared towards assisting the adoptive parents only and not helping the biological family at all in any way. In the Plaintiffs case KO knew Plaintiff had other placement options so did JD but instead went with the "licensed foster home" which is a requirement under federal funding.

26. Plaintiffs poverty level and marital status made her a perfect candidate for this funding violating her civil rights throughout each process, by only targeting citizens like her, this makes their violation a civil matter.

27. The chance that CPS will return to the Plaintiffs door for petty reasons, is highly likely, especially since her child is not yet 12, (the legal age for her to run away and come home.) This government agency has been in contact with Plaintiff every single year of her life since 2009 non-stop. If she was that bad of a parent why is it so hard for them to terminate her rights? Even parents that have had their rights terminated in some cases were unaware of their rights to begin with, and were unfairly prosecuted by the social worker long before a trial took place.

# RELIEF

WHEREFORE, plaintiff Myriam Zayas (Plaintiff), prays for judgment against the defendants as follows:

1. Compensatory damages, including general and special damages, as proven at the time of trial, with interest thereon; according to proof; including for all Plaintiffs children removed prior, or currently without proper warrant or probable cause, dated back from 2002 until now.

2. Punitive damages against defendants Department of Children Youth and Families;

3. Reasonable pro se' fees and costs pursuant to 42 U.S.C. § 1988;

4. Permanent injunctive relief requiring improved policies and training of all CPS social workers nationwide and supervisors in the elimination of use of perjury and fabricated evidence in an effort to gain federal funding. Eliminate the "adoption incentive bonus" and create a bonus for reunification & keeping family's together.

5. Analyze past adoptions to make sure the parent was sober, or if they were under the influence make sure they are sober before terminating their rights and hoping they stay high, so the government can profit from the selling of their child[ren]. Keep this in mind, this is supposedly a disease they are born with (addiction) and can't help so taking their children from them for doing what they are told is part of their disease, is beyond unfair. It is considered a medical condition that health insurance pays for yet hospitals will not treat a drug addicted mother for her "disease". The doctor will call a social worker and have a mothers child removed immediately but will not treat the health condition the mother and child currently present. Instead will put the mother out after stealing her child, they will however continue to treat the child as having a health condition. That is not how a hospital should treat a patient with a disease they

are born with and can't help that they have. Hence the oath hanging on the hospital walls, vowing to serve all who suffer from sickness and/or disease..

6. Such other and further relief as this Court deems just and equitable under the circumstances of this case.

7. Suspend Title IV-E funding for the entire state of Washington until 2025. For violation of the act by illegally removing children to profit from it, forcing foster placement. Despite their being other placement options available.

I. **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A. **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:

*Myriam Zayas*

June 6th 2020 in Kent Washington, USA

Myriam Zayas (Plaintiff)
Kent, WA 98030
amiya.angel@gmail.com